## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS
## FAYETTEVILLE DIVISION

**ZACHARY COOK**                                                                    **PLAINTIFF**

**V.**                              **CASE NO. 5:19-CV-05111**

**SHERIFF TIM HELDER, Washington
County, Arkansas; DEPUTY COLTON BEAVERS;
CORPORAL KURT CORLEY; DEPUTY TRENTCE WALTON;
DEPUTY WESLEY RUCKER; CORPORAL JOEL MINOR;
SERGEANT PATRICK BZOSKI; OFFICER BLANE
PATTERSON; and SERGEANT ROBERT WINGATE**            **DEFENDANTS**

### MEMORANDUM OPINION AND ORDER

This is a civil rights action filed by Plaintiff Zachary Cook pursuant to 42 U.S.C. § 1983. Cook proceeds *pro se* and *in forma pauperis*. He alleges that the named Defendants violated his constitutional rights by failing to protect him from an attack by fellow inmates while he was incarcerated in the Washington County Detention Center ("WCDC"). The Court has received and reviewed the video footage of the incident. (Doc. 48-1).

The case is before the Court on two Motions for Summary Judgment. The first Motion was filed on March 6, 2020, by all Defendants jointly. This Motion addresses official-capacity claims against all Defendants and individual-capacity claims against all Defendants but Deputy Trentce Walton. *See* Doc. 30. Deputy Walton filed a separate Motion for Summary Judgment on March 6 addressing the individual-capacity claims stated against him. *See* Doc. 33. Now that Cook has responded to both Motions, *see* Docs. 37 & 40, the Court is prepared to rule. For the reasons set forth below, the Motions for Summary Judgment are both **GRANTED**, and the case is dismissed with prejudice.

1

## I. BACKGROUND

According to WCDC records, on January 16, 2019, Cook was arrested and booked into the jail. (Doc. 32-2, p. 1). He remained there for several months. On April 10, 2019, Cook was attacked four separate times by multiple inmates. Cook testified at his deposition that the attacks "came out of nowhere" and were a surprise to him. (Doc. 32-7, p. 9). To Cook's knowledge, there was no conflict between himself and any other inmate prior to these attacks. *Id.*

Just before the first attack began, Cook and inmate Thomas Alexander were sitting at a table talking, and to Cook, the discussion "kind of was getting heated." *Id.* Cook testified that Deputy Rucker approached their table to ask if they "were okay," and Cook responded, "Yeah, man, we're all right." *Id.* Cook and Alexander then stood up near the kiosk and continued talking. Inmate William Modisett approached Cook and tapped him on the shoulder. Modisett told Cook that he was "going to have to get out of there." *Id.* at 10. When Cook asked Modisett what he meant by that statement, Modisett swung at Cook. *Id.* Cook picked up Modisett and slammed him on the ground. *Id.* At that point, inmates Alexander, Stephen Pearish, and John Tegins joined the fight. *Id.* After this fight ended, Cook went upstairs and was followed by inmates Modisett, Alexander, Pearish, Tegins, Kane White, and J.V. Lively. *Id.* Modisett attacked Cook for a second time, and Cook claims he was "knocked unconscious." *Id.* Cook believes that he was unconscious for about three or four minutes before getting up and sitting on his bed. *Id.* at p. 11.

According to Cook's account, he was beaten a third time and thrown down the stairs. *Id.* At that point, Cook made his way to the emergency intercom located on the wall next to the book cart and pressed the button. *Id.* No one answered for about a

2

minute. *Id.* Cook claims that he could see Corporal Corley and another officer talking in the control room while he pressed the intercom button. *Id.* Cook pressed the button a second time, and Deputy Beavers answered. *Id.* Cook cannot recall what he said to Deputy Beavers but believes it was something like, "I need to get out of here." *Id.* Deputy Beavers said something in response to Cook, but Cook does not recall exactly what Deputy Beavers said. *Id.* During this conversation, Cook was leaning on the book cart to hold himself up. *Id.*

After a few minutes of waiting for an officer to come to the pod, Cook decided that no one was coming and headed back upstairs, where the inmates beat him a fourth time and knocked him unconscious. *Id.* Cook testified that after this last attack, inmate Vernon Williams picked Cook up, got him downstairs, and pressed the intercom button possibly two times "to finally get somebody to come." *Id.* The officers responded to the call and entered the pod to tend to Cook. *Id.* He was transported to Washington Regional Medical Center and diagnosed with a closed head injury and cervical strain. (Doc. 32-4, p. 2). Because Cook's eyes had been injured in the attack, hospital staff directed him to follow-up with the Henry Eye Clinic and to take over-the-counter Tylenol or Motrin as needed for fever or pain. *Id.* at 3.

When Cook returned to the WCDC, he was placed in administrative segregation. (Doc. 32-4, p. 4). On April 17th, he was taken to the Henry Eye Clinic for an appointment and was examined by Dr. Sarah Covey, who diagnosed contusions in both of his eyes and orbital tissues and a subconjunctival hemorrhaging in each eye. *Id.* at 7. As a result of the attacks, Cook now suffers from paranoia and becomes anxious around groups of people. (Doc. 32-7, p. 16). He also claims that he suffers "chronic headaches pretty

3

much all the time" that interfere with tasks such as exercising. *Id.*

According to the Defendants, the inmates who were involved in the attacks on Cook were issued major disciplinary citations for battery/use of physical force upon a detainee. (Doc. 32-5, p. 7).

### a. Statement of Deputy Rucker

In both his incident report and his affidavit, Deputy Rucker maintains that he was approached at about 5:00 p.m. by Cook and Alexander about a problem they were having. (Doc. 32-5, p. 11; Doc. 32-11, p. 1). Deputy Rucker asked what the issue was, and Cook responded, "man we don[']t have a problem." (Doc. 32-5, p. 11). Deputy Rucker, thinking the issue had been resolved, left the block. *Id.* After Cook was attacked, Deputy Rucker photographed his injuries. *Id.*

Cook testified that Deputy Rucker's only involvement in these events consisted of the 5:00 p.m. discussion he had with Cook and Alexander. (Doc. 32-7, p. 12). Cook also notes that Deputy Rucker was on duty and in pod control when the attack occurred. *Id.* During his deposition, Cook agreed that it was unlikely Deputy Rucker or any other officer witnessed the attacks unless they were watching the cameras just as the attacks were happening. *Id.* at 12–13.

### b. Statement of Deputy Walton

Deputy Walton's report states that at about 5:42 p.m., he was leaving B-pod when inmate Taylor Whiteside handed him a note and told him that it was important and that he should read it and give it to Corporal Corley. (Doc. 32-5, p. 12). While walking to A-pod, Deputy Walton read the note "and saw it said detainee Cook, Zachary (WM) was threatening people in the block." *Id.* Deputy Walton then put the note in his shirt, finished

4

his jail checks, and returned to B-pod control at 5:57 p.m. to hand the note to Corporal Corley. *Id.* Deputy Walton was informing Deputy Beavers that they might need to move Cook when Cook pressed the intercom button for the first time and said, "something no one could understand." *Id.* Deputy Walton claims that when Cook was asked to repeat his statement, Cook "walked away from the intercom." *Id.* A short time later, the intercom was pressed again, "and this time [Cook] was esco[rt]ed out of the block." *Id.* Deputy Walton maintains that he "did not have any information about at a threat to attack Cook or of any substantial risk to his safety." (Doc. 33-2, p. 1).

When Cook was deposed and questioned about his claims against Deputy Walton, he testified that Deputy Walton read the note about Cook but took no steps to ensure his safety. (Doc. 32-7, p. 17). Cook believes that Deputy Walton should have pulled him out of the pod immediately, questioned the inmate who passed the note, or alerted jail staff to a possible threat to Cook's safety instead of simply handing the note to Corporal Corley. *Id.*

### c. Deputy Beavers

In his incident report and affidavit, Deputy Beavers indicates that he was in B-pod control when the intercom sounded for the first time at 6:05 p.m. (Doc. 32-5, p. 7; Doc. 32-9, p. 1). Deputy Beavers claims he answered the intercom by asking, "Can I help you." *Id.* He received no response and then repeated himself. *Id.* When he still received no response, he looked at the camera trained on B-pod and saw a detainee, later identified as Cook, standing at the book cart next to the intercom. *Id.* Deputy Beavers concluded that Cook "had most likely accidentally hit the button while looking at the book cart." *Id.* Deputy Beavers then hung up the intercom. *Id.* He "did not observe anything that

5

indicated an altercation had occurred or that there was a serious risk of an altercation at that time." (Doc. 32-9, p. 1).

At 6:13 p.m., Deputy Beavers noticed that the intercom had been pressed again. (Doc. 32-5, p. 7). He answered, and a detainee responded, "Open the Door." *Id.* Deputy Beavers then said, "What? No." *Id.* The detainee then asked for officers to be sent to B-pod. *Id.* Multiple officers responded while Deputy Beavers remained in pod control. *Id.* Deputy Beavers reviewed the B-pod video afterward and noted that four "separate short fights [occurred] at 5:55 p.m., 5:59 p.m., 6:05 p.m., and 6:10 p.m." *Id.* He claims he was "not aware of any note given by an inmate to Officer Walton referencing Cook on April 10, 2019, prior to the altercation." (Doc. 39-2, p. 2). Also, Deputy Beavers states that he "did not believe Cook was housed in a situation which presented a serious risk to his health or safety." *Id.*

In Cook's view, Deputy Beavers had a duty to investigate when he could not understand what Cook was saying over the intercom. (Doc. 32-7, p. 13). Moreover, Cook believes that he was in visible physical distress at the time he pressed the intercom because he had taken his shirt off, rolled his pants leg up, and was mumbling. *Id.* Deputy Beavers admits he looked at the video feed and saw Cook standing near the intercom button.

### d. Officer Patterson and Corporal Minor

According to Officer Patterson's incident report and affidavit, he and Corporal Minor went to B-pod at 6:13 p.m. in response to a detainee's request via intercom. (Doc. 32-5, p. 6; Doc. 32-14, p. 1). There, they found Cook showing several signs that he had been involved in a physical altercation. He had blood on his face, the majority of his upper

6

body was red from irritation, and he fell to the ground in and out of consciousness. (Doc. 32-5, p. 6). Following a paramedic examination, Cook was placed in a wheelchair to await transport by Central EMS. *Id.* Officer Patterson indicates that he had no further involvement in this incident after that. (Doc. 32-14, p. 1). He did not know about the note given by an inmate to Deputy Walton regarding a threat involving Cook. *Id.* at 1–2. Corporal Minor's report largely mirrors that of Officer Patterson. (Doc. 32-5, p. 9).

Cook testified that both Officer Patterson and Corporal Minor were in pod control when he initially pressed the intercom button, but that neither of them answered his call for help. (Doc. 32-7, p. 13).

### e. Corporal Corley

According to Corporal Corley's report, as he was leaving B-pod control at approximately 5:58 p.m., Deputy Walton handed him a piece of yellow paper, telling him it was "from a detainee." (Doc. 32-5, p. 13). Corporal Corley stopped at the restroom before exiting the pod, and when he came out, he was informed that Cook "just got beat up." *Id.* Corporal Corley then entered B-pod and ordered the inmates to go to their bunks. *Id.* He noticed that inmate Modisett showed obvious signs of having been in a physical altercation and directed him to Deputies Rucker and Zimmerman[1] to have his injuries photographed and to make a statement. *Id.*

Corporal Corley then remembered the piece of paper he had been given by Deputy Walton. According to the first report Corporal Corley made about the incident, he incorrectly recalled that the note stated "that Detainee Cook need[ed] to be moved that he was causing trouble and that he would be beat up." *Id.* Corporal Corley later submitted

---

[1] Deputy Zimmerman is not a party to this action.

an affidavit correcting his earlier report and reporting that the note he received actually stated that *Cook* was threatening others, not that Cook was being threatened. (Doc. 32-10, p. 2). The Court was provided with a copy of the note in question, and it reads: "Please remove Zack Cook from this pod. Zack Cook is threatening people in this pod (B). Thank you." (Doc. 47-1).

### f. Individual Claims Against Supervisory Defendants

Cook's claims against Sergeant Wingate, Sergeant Bzoski, and Sheriff Helder are based on Cook's belief that they had a duty to train jail staff on how to properly respond to: (1) inmates pushing the intercom button once or multiple times, (2) inmates in distress, and (3) inmates passing notes. (Doc. 32-7, p. 5). Cook testified that he did not know what type of training was done in the jail but believed that "nobody should be give[n] a kite[2] 20 minutes before I am beaten for 15 minutes, telling them that I'm going to be attacked, and I need to be removed from the block." *Id.* at 7. Cook believes that an officer should have removed him from the pod prior to the attack, and the failure to do so indicates a lack of proper training. *Id.* at 7–8.

### g. Sergeant Wingate

Sergeant Wingate put Cook into administrative segregation for seven days following his return from the hospital. (Doc. 32-5, p. 8). Inmate Modisett, who at the time was the only other inmate identified as having participated in the attacks, was also placed in administrative segregation. *Id.* Sergeant Wingate indicates that his involvement in this case was limited to assigning new housing to Cook and Modisett within the jail after the attacks. (Doc. 32-15, p. 1). Cook testified that Sergeant Wingate was the sergeant on

---

[2] "Kite" is another word for "note" in the prison context.

duty at the time of the attacks. (Doc. 32-7, p. 7).

### h. Sergeant Bzoski

By affidavit, Sergeant Bzoski states that he became aware there was an injured inmate in B-pod shortly after 6:00 p.m. on April 10th. (Doc. 32-13, p. 1). Sergeant Bzoski became "involved in the investigation by gathering photos, seeking statements, and reviewing video of the event." *Id.* Sergeant Bzoski maintains that he was not present in B-pod during the altercation but rode with Cook to the hospital after he was injured. *Id.*

### i. Sheriff Helder

Sheriff Helder also submitted an affidavit in this case. In it, he explains that he is "not personally involved in the daily operations within the detention center including, but not limited to, things such as inmate supervision, medication distribution, or housing decisions." (Doc. 32-8, p. 1). Instead, he "employ[s] a chain of command to supervise the employees in the various divisions of the sheriff's department." *Id.* Sheriff Helder maintains that he was not on duty in the detention center on April 10, 2019, did not observe any fight, was not present in Cook's housing area, and was unaware of any note given to Deputy Walton. *Id.* at p. 2.

### j. Official-Capacity Claims

With respect to his official-capacity claims, Cook believes that the County's practice of having only one officer present in pod control to monitor seven separate blocks and of assigning only three floor officers to patrol the pod indicates that the jail is understaffed. (Doc. 32-7, p. 8). Cook explains that in order for officers on duty to directly see into the blocks, they must walk downstairs, which increases the risk that inmates will be attacked without officers noticing. *Id.* Cook also believes that the appropriate County

9

custom should be that if an officer is told there is a "problem in the block, they're supposed to at least investigate it." *Id.* at 14. According to Cook, the Defendants violated this custom by failing to investigate reports of a "problem," even though they were given forewarning of the event in the form of a note from a detainee. *Id.*

Cook also points out that there have been other instances of violence in the jail where detention personnel have failed to respond. (Doc. 32-7, p. 15). He notes that some time prior to his attack, there was an "hour-long race riot between Mexicans and blacks where they were stabbing each other in the middle of the barracks for 45 minutes, and nobody came." *Id.* Cook testified that detention personnel often do not respond to inmates being beaten. *Id.* He believes it is because they cannot see into the pods easily and because there are not enough officers to protect the inmates. *Id.*

## II. LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); Fed. R. Civ. P. 56(a). A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). "An issue of material fact is genuine if it has a real basis in the record," *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1982), or "when a reasonable jury could return a verdict for the nonmoving party on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (citation and quotation marks omitted).

10

"Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *Nat'l. Bank of Comm. v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir. 1999). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *Nat'l. Bank of Comm.*, 165 F.3d at 607 (citing *Anderson*, 477 U.S. at 249). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (citing *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## III.   DISCUSSION

The WCDC Defendants collectively move for summary judgment on the following grounds: (1) there was no personal involvement by Sergeant Wingate, Sergeant Bzoski, or Sheriff Helder; (2) the rest of the Defendants who were sued in their individual capacities were not deliberately indifferent to a substantial risk to Cook's health or safety; (3) there is no basis for official-capacity liability; and (4) even if Cook managed to make out a claim of constitutional dimension against the Defendants, they would still be entitled to qualified immunity for their actions.

Deputy Walton argues in his separately-filed summary judgment motion that Cook's individual-capacity claim against him is based solely on the fact that Deputy

11

Walton allegedly failed to take preventative action to protect Cook after an inmate passed him a note/kite.   Deputy Walton asserts that "the language of the kite provided no information about a threat, specific or otherwise, to Cook, and did not tell Walton that Cook was about to be attacked, or by whom." (Doc. 33, p. 1-2).  Accordingly, Deputy Walton believes that Cook cannot demonstrate deliberate indifference on his part. *Id.* at 2.

### A. Individual-Capacity Claims Against the Supervisory WCDC Defendants

Individual liability under § 1983 must be based on personal involvement. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). "Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights.  To establish personal liability of the supervisory defendant, [Cook] must allege specific facts of personal involvement in, or direct responsibility for, a deprivation of [his] constitutional rights." *Clemmons v. Armontrout*, 477 F.3d 962, 967 (8th Cir. 2007) (quoting *Mayorga v. Missouri*, 442 F.3d 1128, 1132 (8th Cir. 2006)); *see also Keeper v. King*, 130 F.3d 1309, 1314 (8th Cir. 1997) (noting that "general responsibility for supervising the operations of a prison is insufficient to establish personal involvement required to support [§ 1983] liability").

A defendant in a § 1983 suit cannot be held vicariously liable for the acts of another. *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010).  In other words, Sergeant Wingate, Sergeant Bzoski, and Sheriff Helder may not be held liable for the constitutional violations of a subordinate solely based on the employment relationship. *Id.*

Cook's only evidence of Sergeant Wingate's involvement is that he was a shift sergeant at the time of the attacks. This is insufficient to establish individual liability. Cook has no evidence that Sergeant Wingate was on notice that Cook would be attacked or

was deliberately indifferent to the risk.  Sergeant Bzoski also appears to have been sued in his individual capacity because he was a shift sergeant.  However, Cook does not dispute Sergeant Bzoski's assertion that he did not know that Cook was being attacked until after the attacks were over.  Sergeant Bzoski took photographs of Cook's injuries, rode with Cook to the hospital, took photos of Modisett's injuries, and obtained a statement from Modisett.  Considering the record on summary judgment, Cook has failed to create a genuine dispute of material fact that Sergeants Wingate or Bzoski personally violated his constitutional rights.

With respect to Cook's individual-capacity claims against Sheriff Helder, it is undisputed that Sheriff Helder was not present in the detention center at the time of the attacks on Cook.  Further, there is no evidence of record that would suggest Sheriff Helder had knowledge that Cook would be attacked, gave any orders regarding the attack or the investigation into the same, or even spoke to the other named Defendants about the attack or its aftermath.  Clearly, Sheriff Helder is not liable for any constitutional violation in his individual capacity.

Lastly, Cook brings failure-to-train claims against Sergeant Wingate, Sergeant Bzoski, and Sheriff Helder in their individual capacities.  A supervisor may be held liable for failing to train a junior officer when that failure "amounts to deliberate indifference to the rights of persons with whom the police come into contact.  In such a situation, a plaintiff must also prove that the alleged failure to train 'actually caused' the constitutional deprivation."  *Parrish*, 594 F.3d at 1002.  "To prove deliberate indifference, the plaintiff must show that the supervisor had notice that the training procedures were inadequate

and likely to result in a constitutional violation." *Perkins v. Hastings*, 915 F.3d 512, 524 (8th Cir. 2019) (citation and internal quotations omitted).

There is nothing in the summary judgment record to indicate that Sergeant Wingate, Sergeant Bzoski, or Sheriff Helder failed to ensure that detention personnel were appropriately trained on responding to threats of violence or to fights between inmates. Further, there are no facts in the record that show these supervisors were aware—or were put on notice—that their training methods were so inadequate as to likely result in a constitutional violation. The officers on duty on the day of the attacks on Cook failed to check on him after he pressed the emergency button for the first time; however, it is undisputed that multiple officers entered the pod and administered aid to Cook after the emergency button was pressed again several minute later. Cook does not dispute that the first time he pressed the emergency button, Deputy Beavers responded. Cook also does not dispute that when he spoke to Deputy Beavers over the intercom, Cook never told Deputy Beavers that he was hurt or had been in a fight. Cook admits he could not recall what Deputy Beavers said to him or how Cook responded. These facts show, at most, that Deputy Beavers was negligent in failing to send officers to the pod to check on Cook after he pressed the emergency button the first time; but the facts do not show that the officers on duty were aware of a risk of harm to Cook's health and safety and were deliberately indifferent to that risk of harm.

In addition, the video feed of Cook's first intercom contact with Deputy Beavers unambiguously shows Cook standing shirtless in the pod next to the intercom button and periodically leaning his torso against the book cart, sometimes for several seconds at a time. *See* Doc. 48-1, B-Block video #2, 16:26–19:53). Cook never sits or lies down on

14

the floor, holds any body part, or shows signs of bleeding during this interaction. *Id.* The video, even taken in the light most favorable to Cook, is insufficient to establish a genuine, material dispute that Deputy Beavers or any other officer on duty was deliberately indifferent to a risk of harm to Cook due to a failure to train or otherwise.

For all these reasons, Sergeant Wingate, Sergeant Bzoski, and Sheriff Helder are entitled to summary judgment on the individual-capacity claims asserted against them.

### B. Failure-to-Protect Claim Against the Remaining Defendants

Prison officials have a duty under the Eighth Amendment to protect inmates convicted of crimes from violence at the hands of other inmates. *Perkins v. Grimes,* 161 F.3d 1127, 1129 (8th Cir. 1998). However, not "every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer v. Brennan,* 511 U.S. 825, 834 (1994).

To prevail on his failure-to-protect claim against the non-supervisory Defendants, Cook must satisfy a two-pronged test showing that: (1) he was "incarcerated under conditions posing a substantial risk of serious harm," and (2) prison officials were "deliberately indifferent [to Cook's] health or safety." *See Holden v. Hirner,* 663 F.3d 336, 341 (8th Cir. 2011) (internal citations omitted).

The first prong of the test is an objective requirement to ensure that the deprivation of the constitutional right at issue is sufficiently serious. *Nelson v. Shuffman*, 603 F.3d 439, 446 (8th Cir. 2010). The deprivation is considered "objectively, sufficiently serious, under the first requirement when the official's failure to protect resulted in the inmate being incarcerated under conditions posing a substantial risk of serious harm." *Id.* (internal punctuation marks and citations omitted). The second prong, however, is subjective and

requires Cook to show that the official "both knew of and disregarded 'an excessive risk to inmate's health or safety.'" *Holden*, 663 F.3d at 341 (quoting *Farmer,* 511 U.S. at 837). "An official is deliberately indifferent if he or she actually knows of the substantial risk and fails to respond reasonably to it." *Young v. Selk,* 508 F.3d 868, 873 (8th Cir. 2007).

Negligence alone is insufficient to meet the second prong; instead, the official must "recklessly disregard a known, excessive risk of serious harm to the inmate." *Davis v. Oregon Cnty.,* 607 F.3d 543, 549 (8th Cir. 2010) (internal quotation marks and citation omitted). A plaintiff "need not show 'that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm.'" *Nelson*, 603 F.3d at 447 (quoting *Farmer*, 511 U.S. at 842).

In his written responses to the two Motions for Summary Judgment, Cook stresses that his failure-to-protect claim is based on the fact that the note/kite mentioning him was given by another inmate to Deputy Walton approximately twenty minutes prior to the first attack. *See, e.g.,* Doc. 38, p. 1; Doc. 40, p. 1. Cook maintains that Deputy Walton acted with deliberate indifference in violation of WCDC policy when he read the note but failed to follow up immediately to determine whether Cook faced a possible risk of harm. (Doc. 38, p. 1). Finally, Cook argues that the conversation between Deputy Walton and Corporal Corley presents disputed issues of fact that preclude summary judgment, since the substance of their conversation will determine whether Corporal Corley's inaction contributed to Cook's injuries and constitutes deliberate indifference. (Doc. 41, p. 2).

Cook also points to the fact that Deputy Walton was advising Deputy Beavers that they might need to move Cook out of the pod at about the same time that Cook first

16

pressed the intercom button. (Doc. 32-5, p. 12). Cook therefore contends that Deputy Beavers had some advance knowledge that there was an issue in the pod involving Cook and that Deputy Beavers should have taken steps to protect Cook immediately—and then investigate further when Cook pressed the intercom button for the first time. (Doc. 41, p. 1). Cook argues that summary judgment is inappropriate because Deputy Walton, Corporal Corley, and Deputy Beavers "were all notified of an issue involving [Cook] and all violated the policy and procedure of the [WCDC]" by not protecting Cook from attack. (Doc. 41, p. 2); *see also* Doc. 41, p. 3.

Under the *Holden* test, Cook must point to at least some facts to indicate that the individual Defendants knew that there was a substantial risk that Cook would suffer serious harm in the WCDC; then, he must point to facts to show that these officers recklessly disregarded that risk. 663 F.3d at 341. The only piece of evidence Cook highlights to establish the Defendants' advance knowledge of any risk of harm is the note Deputy Walton received from another inmate. As previously observed, this note indicated that *Cook* was the one making threats. Further, it is undisputed that Cook had not previously raised any issue about his safety with jail officials prior to the attacks, and he testified that he was, if fact, surprised by the attacks and did not know that any inmate wished him harm. Though Cook argues that the Defendants had a duty to investigate the note immediately and take action, the Court disagrees. The plain language of the note conveys no sense of urgency and implicates only Cook as an aggressor. Accordingly, the note does not create a genuine, material dispute of fact that the Defendants were deliberately indifferent to a risk of serious harm to Cook.

With respect to Cook pushing the intercom button the first time and not receiving

17

immediate assistance, the Court similarly finds that the facts surrounding this incident, even when taken in the light most favorable to Cook, fail to establish a jury question about whether the Defendants recklessly disregarded a serious risk of harm to Cook. Deputy Beavers answered the first intercom alert after about a minute. (Doc. 32-7, p. 11). He said something to Cook, though Cook does not recall what he said. *Id.* Deputy Beavers also claims that he could not understand what Cook was saying and asked Cook to repeat himself. Cook, for his part, does not dispute Deputy Beavers's account. For all these reasons, the Court cannot find that the first intercom alert or the intercom alert coupled with the note about Cook are facts that show that the Defendants understood there was a substantial risk of serious harm to Cook and deliberately and recklessly disregarded that risk. Their failure to check on Cook after the first intercom alert—even if negligent— is not actionable under § 1983. *See Walton v. Dawson*, 752 F.3d 1109, 1117 (8th Cir. 2014) (holding that under the deliberate indifference standard, no liability attaches unless the prison official "*knows of* and disregards an excessive risk to inmate health and safety") (internal quotation marks and citation omitted).

The remaining Defendants are entitled to summary judgment on the failure-to-protect claim against them in their individual capacities.[3]

---

[3] Cook also refers in passing to his right to Equal Protection. *See, e.g.,* Doc. 40, p. 2. To the extent Cook has attempted to assert an Equal Protection claim, the claim fails. The Fourteenth Amendment provides in relevant part that no state shall "deny any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. The Equal Protection Clause generally requires similarly situated inmates to be treated alike. *Bogren v. Minnesota*, 263 F.3d 399, 408 (8th Cir. 2000). Cook has made no showing that other, similarly situated inmates received more favorable treatment than he did.

18

### C. Official-Capacity Liability

Official-capacity claims against a defendant are "functionally equivalent to a suit against the employing governmental entity." *Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010). Accordingly, Cook's official-capacity claims are treated as claims against Washington County. *See Murray v. Lene*, 595 F.3d 868, 873 (8th Cir. 2010). "Thus to sustain [the official-capacity claims, Cook] must prove that the County *itself* caused the constitutional violation at issue." *Marsh v. Phelps County*, 902 F.3d 745, 751 (8th Cir. 2018) (internal quotation marks and citation omitted). "[I]t is well established that a municipality cannot be held liable on a *respondent superior* theory, that is, solely because it employs a tortfeasor." *Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201, 1214 (8th Cir. 2013). To establish liability on the part of Washington County under Section 1983, Cook "must show that a constitutional violation was committed pursuant to an official custom, policy, or practice of the governmental entity." *Moyle v. Anderson*, 571 F.3d 814, 817 (8th Cir. 2009) (citation omitted).

No official-capacity claims may be maintained against the County, since Cook has failed to establish a genuine dispute of material fact concerning the deprivation of his constitutional rights. *See, e.g., Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 694 (1978) (a constitutional violation must have occurred, and it must be shown that a policy or custom of the County was the moving force behind the alleged constitutional violation). Even if the Court assumes that Cook has demonstrated a violation of his constitutional rights, his official-capacity claims would still fail because they are premised on the fact that Defendants, who are employees of the WCDC, allegedly failed to follow the appropriate policies and procedures for the protection of inmates and were negligent in

19

the performance of their assigned duties.  (Doc. 25, p.p. 5-7).  Cook's assertion that Defendants failed to follow WCDC policy cannot state a constitutional claim.  *Gardner v. Howard*, 109 F.3d 427, 430 (8th Cir. 1997).

As for Cook's allegation that the WCDC was understaffed, which resulted in the staff's failure to notice the attacks and respond appropriately, the Court disagrees that understaffing may have led to the deprivation of Cook's constitutional rights.  The four separate attacks on Cook took place over approximately fifteen minutes, with each separate fight, by Cook's own accounting, lasting only a few minutes at most.  The fragmented nature of the attacks and Cook's movements around the pod may have contributed to the Defendants' failure to notice that the attacks were occurring.  Indeed, the Court reviewed the video feed of the attacks and can only make out the first fight clearly, while the others are difficult to see at all.  It is undisputed that Cook gave the officers no advance warning that he was worried about his safety, and the note the officers received about Cook stated only that he was a possible threat to others.  Even though all of the facts, taken collectively, may demonstrate negligence on the part of the officers present in pod control, such cannot form the basis of an official-capacity claim.  *See Hamner v. Burls*, 937 F.3d 1171, 1177 (8th Cir. 2019) (noting that a prisoner must show more than negligence and even gross negligence to make out a constitutional violation). The official-capacity claims are, therefore, dismissed.

### D. Qualified Immunity

Since the facts in this case do not make out any constitutional violations, the Court need not address whether the Defendants are entitled to qualified immunity.

## IV.   CONCLUSION

**IT IS ORDERED** that Defendants' Motions for Summary Judgment (Doc. 30 & 33)

are **GRANTED** and this case **DISMISSED WITH PREJUDICE.**   A judgment in

accordance with this Opinion and Order will be entered this same day.

**IT IS SO ORDERED** on this _____ day of July, 2020.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE